IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KRISTINA M. ALLEN,                                          CV. 04-782 PK

             Plaintiff,                        OPINION AND ORDER

      v.

JOANNE B. BARNHART
Commissioner of Social Security,

           Defendant.

PAPAK, Magistrate Judge:

## INTRODUCTION

Plaintiff Kristina Allen ("Allen"), brings this action pursuant to the Social Security Act, 42 USC § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for Supplemental Security Income ("SSI") payments. For the reasons set forth below, the decision of the Commissioner is remanded for further administrative proceedings consistent with this opinion.

## PROCEDURAL BACKGROUND

1  - OPINION AND ORDER

Allen filed this application[1] for SSI on March 6, 2002, alleging disability from March 5, 1997, due to depression, anxiety, post-traumatic stress disorder ("PTSD"), bipolar disorder, and a personality disorder.   Her application was denied initially and upon reconsideration.  On December 9, 2003, a hearing was held before an Administrative Law Judge ("ALJ").   In a decision dated January 31, 2004, the ALJ found Allen was not entitled to benefits.  On May 22, 2004, the Appeals Council denied Allen's request for review, making the ALJ's decision the final decision of the Commissioner.  Allen now seeks judicial review of the Commissioner's decision.

## **STANDARDS**

A claimant is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 USC § 423(d)(1)(A).  The initial burden of proof rests upon the claimant to establish his or her disability.  *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995), *cert. denied*, 517 US 1122 (1996). The Commissioner bears the burden of developing the record.  *DeLorme v. Sullivan*, 924 F2d 841, 849 (9th Cir 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole.  42 USC § 405(g); *see also Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant

---

[1]  Allen filled  out an application for SSI on March 12, 1998, asserting disability since August 1, 1997.  Tr. 124-73.  The disposition of that application is not clear.

evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews*, 53

F3d at 1039.  The court must weigh all of the evidence, whether it supports or detracts from the

Commissioner's decision.  *Martinez v. Heckler*, 807 F2d 771, 772 (9th Cir 1986).  The

Commissioner's decision must be upheld, however,  if  "the evidence is susceptible to more than

one rational interpretation." *Andrews*, 53 F3d at 1039-40.

<u>**DISABILITY ANALYSIS**</u>

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is

disabled within the meaning of the Act.  20 CFR §§ 404.1520, 416.920.  Below is a summary

of the five steps, which also are described in *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir

1999):

<u>Step One</u>.  The Commissioner determines whether claimant is engaged in substantial

gainful activity.  If so, claimant is not disabled.  If claimant is not engaged in substantial gainful

activity, the Commissioner proceeds to evaluate claimant's case under step two.  20 CFR

§§ 404.1520(b), 416.920(b).

<u>Step Two</u>.  The Commissioner determines whether claimant has one or more severe

impairment.  If not, claimant is not disabled.  If claimant has a severe impairment, the

Commissioner proceeds to evaluate claimant's case under step three.  20 CFR §§ 404.1520(c),

416.920(c).

<u>Step Three</u>.  Disability cannot be based solely on a severe impairment; therefore, the

Commissioner next determines whether claimant's impairment "meets or equals" one of the

impairments listed in the Social Security Administration (SSA) regulations, 20 CFR Part 404,

Subpart P, Appendix 1.  If so, claimant is disabled.  If claimant's impairment does not meet or

equal one listed in the regulations, the Commissioner's evaluation of claimant's case proceeds under step four.  20 CFR §§ 404.1520(d), 416.920(d).

Step Four.  The Commissioner determines whether claimant is able to perform work he or she has done in the past.  If so, claimant is not disabled.  If claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of claimant's case proceeds under step five.  20 CFR §§ 404.1520(e), 416.920(e).

Step Five.  The Commissioner determines whether claimant is able to do any other work. If not, claimant is disabled.  If the Commissioner finds claimant is able to do other work, the Commissioner must show a significant number of jobs exist in the national economy that claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert ("VE") or by reference to the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates a significant number of jobs exist in the national economy that claimant can do, claimant is not disabled.  If the Commissioner does not meet this burden, claimant is disabled.  20 CFR §§ 404.1520(f)(1), 416.920(f)(1).

At steps one through four, the burden of proof is on the claimant.  *Tackett*, 180 F3d at 1098.  At step five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  *Id*

### ALJ's DECISION

At step one, the ALJ found Allen had not engaged in substantial gainful activity since the alleged onset of her disability.

At step two, the ALJ found Allen had the medically determinable severe impairment of depression.

At step three, the ALJ found that Allen's impairments did not meet or medically equal the criteria of any listed impairments.

At step four, the ALJ found that Allen was not fully credible and retained the residual functional capacity to perform simple, repetitive, routine work with no public interaction and only occasional interaction with coworkers. The ALJ found that Allen had mild limitations in her activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. As a result, she can not perform her past relevant work.

At step five, the ALJ found that Allen can work at such unskilled light exertion jobs as an office cleaner, bakery worker, or stock room worker, and therefore is not disabled.

## **DISCUSSION**

Allen contends that the ALJ erred by: (1) rejecting the opinions of her treating physicians; (2) failing to identify additional severe impairments; (3) finding her capable of sustaining work; (4) rejecting lay witness testimony; and (5) failing fully and fairly to develop the record.

I. Medical Evidence

Born in 1979, Allen was 24 years old at the time of the ALJ's decision. Tr. 67[2]. She has worked in fast-food service and as a baby sitter. Tr. 128.

_____

[2]Citations are to the page(s) indicated in the official transcript of the record filed with the Commissioner's Answer.

5  - OPINION AND ORDER

In November 1989, at the age of ten, Allen was referred to counseling by her school for depression. Tr. 121, 123. In April 1990 a peer reported that Allen was contemplating suicide, and counseling helped "for the moment-but she was exhibiting depression and rejection again within an hour." Tr. 123. About one week later, another student reported that Allen was contemplating suicide, and Allen appeared "very despondent." Tr. 122. Behavioral observations by her teachers included that Allen rarely completed tasks on time, was frequently unable to follow directions given in group instruction, and often obeyed the teacher only when threatened with punishment. Tr. 119. She was rarely able to work independently, often talked out in class without permission, was disruptive, and was often likely to quit when a task was difficult. *Id.* Allen was classified as "seriously behaviorally disabled," and received special educational services pursuant to an Individualized Education Program from 1990 through 1997. Tr. 72-123, 117. In November 1994 Allen entered ninth grade in an alternative school with a reading grade score of 5.0, mathematics grade score of 5.6, and a written language grade score of 5.3. Tr. 93. David Worthen, a Tacoma Public School Special Education Psychologist evaluated Allen on November 1, 1994. Dr. Worthen noted that Allen's academic skills remained significantly delayed, and indicated that if she enrolled in a traditional high school she would require academic assistance in mathematics, English, and reading, and "a realistic career training plan." Tr. 93-94.

On February 15, 1997, Timothy Earnest, M.D., a psychiatrist, examined Allen after she was treated in the emergency room for a knife wound to her abdomen. Tr. 240-45. Allen told Dr. Earnest that she had not been depressed during the past year, though she had some anxiety. Allen's stepfather told Dr. Earnest that Allen had been sexually molested at the ages of two, five,

and seven, and placed in foster care when Allen's mother and stepfather were arrested for possession of marijuana. Allen's stepfather reported that Allen had been an alcoholic since the age of eleven, and had threatened to kill herself on several occasions. Allen had attempted suicide in the sixth grade by tying a shoelace around her throat. The stepfather had been the subject of a restraining order after he hit Allen. *Id.* Allen's mother had left the home approximately a year before the examination. Allen believed she left because of drug use. Tr. 243.

Allen was living with her boyfriend in an abusive relationship, and had dropped out of school. Allen said the wound was the result of an accident, but due to "concerns about possible suicidal ideation or a possible suicide attempt," she had been transferred to a psychiatric hospital. Tr. 240. Dr. Earnest noted some psychomotor slowing, poor insight, and poor judgment. He stated that Allen's history of poor judgment and problem-solving skills placed her at an increased risk of chronic psychiatric illness. Tr. 243. He diagnosed depressive disorder, parent-child relational problems, alcohol and cannabis abuse, and borderline personality traits. Tr. 244.

Allen was referred to a children's crisis therapist at Comprehensive Mental Health. On February 18, 1997, she agreed to a no-harm contract, and was referred to ongoing stabilization services. Tr. 314. Her boyfriend was in anger management classes, and she reported that he was no longer yelling at her or hitting her. Clinical observations included anger, anxiety, apprehension, depression, and sadness. Tr. 322. She displayed "impaired ability to manage daily living activities" and "impaired ability to make reasonable life decisions." *Id.* Allen lived briefly with a friend and the friend's mother, but on March 5, 1997, she reported that she was in a "bad environment," that her friend was using crack cocaine, that her friend's mother was an

alcoholic, and that there was violence in the home. Tr. 319.  On March 6, 1997, Allen reported

that she was living in an unfinished cottage on another friend's property.  Tr. 313. On March 16,

1997,  Allen decided that she no longer needed counseling, and services were discontinued on

that date.

On December 5, 1997, Allen contacted Comprehensive Mental Health seeking a crisis

therapist and ongoing therapy.  Tr. 311.  On December 12, 1997, Counselor Michael Hammer,

M.S.W.,  wrote:

> Clt is a fragile young women [sic] who until recently has depended
> upon her homeless, assaultive, and abusive boyfriend, for her basic needs.
> Clt is insightful, guarded around new people, and desires to better her life.
> Clt would do optimally in a supportive environment to bolster her self-
> esteem, and growing autonomy. There appears to be longstanding issues
> regarding feeling unsupported by family, and concern for her mother.

Tr. 313.  On December 17, 1997, Mr. Hammer drove Allen to "DSHS"  (a Washington State

social services agency) and "helped clt figure out how she would proceed."  Tr. 308.  Allen was

"overwhelmed by the information, and [Hammer] helped clt to pace her self...."  *Id.*  Mr.

Hammer reviewed the information with Allen, and encouraged her to make a task list.

On December 22, 1997, Allen cancelled that day's counseling session in order to spend

time with her grandmother.  Tr. 306.  On December 30, 1997, a crisis counselor drove Allen to a

social service agency to file applications for food stamps and medical coverage.  Tr. 305.

On January 8, 1998, Allen reported that her boyfriend was incarcerated on assault

charges arising out of his physical and sexual abuse of her.  Tr. 329.  Allen was taking zoloft.

She had trouble eating and sleeping, she was angry and withdrawn, and she had anxiety and

crying spells.  *Id.*  She had been sober for four months, although she "occasionally relapsed."  Tr.

324. She did not know her birth father.  The assessor, whose name is illegible, diagnosed

8  - OPINION AND ORDER

dysthymic disorder, rule-out major depressive disorder, and assessed a Global Assessment of Functioning ("GAF") score of 50[3].  Tr. 326.

In February 1998 Allen met with her counselor multiple times.  She registered for an alternative school, but was unable to start due to a medical emergency.  Tr. 301.  In March 1998 the counselor reported that Allen was "beginning to stabilize," and was "remaining clean."  Tr. 300.  Allen had a new residence and a telephone.  In April 1998 Allen's counselor accompanied her to collect and fill out job applications.  Tr. 299.  Allen had missed two counseling appointments, and reported that her former boyfriend's mother and family were moving in with her.

In mid-June 1998, Allen's counselor reported that Allen and her boyfriend had been forced to leave the boyfriend's grandfather's home by his mother, following an accusation of substance abuse, which Allen denied.  Allen was now staying at what she termed a "halfway house."  Tr. 298.   The counselor reported that Allen had "no showed" for several appointments, and the counselor had gone to the residence which she described as "an extremely unstable living situation.  Also likely house is not a clean and sober place."  *Id.* (emphasis in original).

On June 29, 1998, Allen reported that she had to move and did not know where she would go.  She requested and received a list of shelters.  Her counselor noted that Allen was

---

[3]  The GAF scale is a tool for "reporting the clinician's judgment of the individual's overall level of functioning."  American Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000)).  It is essentially a scale of zero to 100 in which the clinician considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," not including impairments in functioning due to physical or environmental limitations.  *Id* at 34.  A Global Assessment of Functioning ("GAF") score between 41 and 50 indicates "Serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)."  *Id* at 32.

asleep when she arrived at 12:30 p.m., and that Allen had cut her hair "in spots all over her head." Tr. 297. Allen agreed to call the counselor when she knew where she would be. The counselor attempted to help Allen move to a shelter, but was unable to find her, and services were discontinued. Tr. 285, 297.

On June 23, 1999, Allen again sought therapy at Comprehensive Mental Health. Tr. 293. She wanted to resume taking zoloft, and felt increasingly depressed. However, she missed her scheduled appointment. *Id.*

On April 3, 2000, Allen was evaluated for depression by Clackamas County Mental Health Center, referred by her boyfriend's mother. Tr. 364-65. She reported depression and loneliness since her mother abandoned her in 1996. Apparently, she had recently attempted suicide and had been treated in the emergency room, though those records are not in this file. Allen reported difficulty sleeping, tearfulness, a hernia and a cracked vertebra. She was pregnant. *Id.* Cheryl Wilson, M.S./L.P.C. diagnosed dysthymia and assessed a GAF of 50. Allen was referred to group therapy, but missed most of the appointments. Tr. 371-89. Services were terminated in January 2001 because of Allen's failure to appear. Tr. 195-96.

Melinda M. Tonelli, M.D., examined Allen on April 23, 2001. She diagnosed depression and prescribed Remeron. Tr. 413. On May 14, 2001, Allen reported her depression was improved but not gone. Tr. 411. She had contemplated suicide again, and was fatigued, sad, and anxious. She reported hearing voices and thought that someone was watching her. *Id.*

On October 26, 2001, Allen reported intermittent abdominal pain for the past month and depression and anxiety. Tr. 409. Dr. Tonelli prescribed Paxil because the Remeron made her too sleepy.

10 - OPINION AND ORDER

On February 25, 2002 Allen was admitted to the psychiatric ward at Legacy Good

Samaritan Hospital due to suicidal ideation and her inability to contract for safety.  Tr. 405-06.

Psychiatrist Jamie Read, M.D. examined Allen, and reported that Allen was being treated in a

clinic for a leg cyst when she stated that she was suicidal and did not feel safe to go home. She

voluntarily came to the psychiatric unit, but on arrival "immediately wanted to go home."  Tr.

421.  Allen "became upset, tearful, and was described as angry, swearing, and belligerent,

because she could not immediately leave." *Id.*  Allen stated that she had wanted to be

hospitalized last week, but not now.  She had been taking Paxil regularly for about two months.

She reported anxiety and racing thoughts, and alternated between saying that her baby was the

only thing that mattered to her, and that it did not matter what happened to her, because she

knew that her child would be well- cared for. Tr. 421.   Allen had a plan to choke herself or

jump out a window, and she said that she had tried to choke herself.   Allen was retained

overnight on an involuntary hold.  Dr. Read diagnosed suicidal ideation, prior to admission, and

bipolar disorder, mixed state, with a GAF of 40.  Dr. Read planned to taper Allen off the Paxil

and begin Depakote and Ativan.  Tr. 423.

On May 8, 2002, Luke Patrick, Ph.D., performed a consultative psychodiagnostic

evaluation of Allen.  Tr. 431-37.  Dr. Patrick's report was based on assessment and intake notes

from Network Behavioral Health Care dated February 27, 2002 and March 5, 2002, and Allen's

self-report.  Dr.  Patrick concluded that Allen

> appears to meet criteria for major depressive disorder with
> notable features of agitation and irritability.  She does not,
> however, meet criteria for bipolar disorder.  Although she
> does become agitated and irritable, this appears to be in the
> course of her depression.  She has not experienced sleeplessness,
> euphoria, or risky behaviors associated with a manic episode.

11  - OPINION AND ORDER

> Although she has a history of volatile emotional relationships
> as well as desperate behavior such as a previous suicide
> attempt, she does not appear to meet full criteria for borderline
> personality disorder.  The client's strength appears to lie in the
> fact that she has been recognizing dysfunctional thoughts and
> behaviors over the past few months, and has sought treatment
> for these.  She does appear to have an external focus of control
> with regard to dealing with these symptoms, as she made
> reference on several occasions to finding a medication that
> will solve her emotional problems.

Tr. 435.  As to Allen's ability to work, Dr. Patrick stated she

> certainly has shown a spotty vocational history at best.  This is
> likely influenced by both psychosocial factors as well as
> possibly limited intellectual functioning.  In particular, the client
> may lack some of the attentional and/or basic achievement skills
> necessary for many forms of work.  Cognitive testing may be
> useful to help clarify this and make further recommendations
> regarding vocational training and related options.

Tr. 436.

On May 22, 2002, Allen was evaluated by Sandra S. Sakurai[4], M.S., at Mt. Hood

Community Mental Health Center.  Tr. 458.  Allen had no primary care physician and  was on

the Oregon Health Plan.  Allen reported life-long depression, with the latest episode lasting six

months.  She had low self-esteem and frequent suicidal ideation.  Allen heard voices that "press

her toward" suicide.  *Id.*  Ms. Sakurai diagnosed major depression disorder, recurrent, rule-out

borderline personality disorder, and schizophrenia.  She assessed a GAF of 50.  *Id.*  Allen

received counseling through May and June, and began taking Depakote, Zyprexa and Effexor for

---

[4]Under social security regulations governing weight to be accorded to medical opinions,
"acceptable medical sources" does not include holders of an M.S. degree.  20 CFR §§
404.1513(a) and (d)(3), 416.913(a) and (d)(3).  The Commissioner is permitted to accord
opinions from other sources less weight than opinions from acceptable medical sources.  *Gomez
v. Chater, 74 F3d 967* (9th Cir 1996).

depression and anxiety.  Tr. 460-62.  On June 18, 2002, Allen reported feeling less depressed and anxious, and inquired about a GED class.   Tr. 459.

On July 10, 2002, Ms. Sakurai assessed Allen as at "High Risk" of deterioration without immediate intervention, and scheduled individual and group counseling.  Tr. 507-10.  She diagnosed post-traumatic stress disorder, major depressive disorder, and bipolar disorder, and assessed her GAF at 50.  Tr. 508. By August 20, 2002, Allen was doing "much better," her medicines were "helping a lot," and she had not experienced suicidal ideation since starting the medications.  Tr. 492.  Allen missed many of her group therapy appointments in October and November 2002.  Tr. 511-16.

## II.  Treating and Examining Physicians

Allen contends that the ALJ erred by effectively rejecting the opinions of the treating and examining physicians,  Drs. Worthen,  Earnest, Read, and Patrick  If a treating physician's medical opinion is supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record, the treating physician's opinion is given controlling weight.  *Holohan v. Massanari,* 246 F3d 1195, 1202 (9th Cir 2001); 20 CFR § 404.1527(d)(2).   In general, the opinion of specialists concerning matters relating to their specialty are entitled to more weight than the opinions of nonspecialists.  *Id.;* § 404.1527(d)(5). An ALJ may reject the uncontradicted medical opinion of a treating physician only for "clear and convincing" reasons supported by substantial evidence in the record.  *Id.* at 1202, citing *Reddick v. Chater,* 157 F3d 715, 725 (9th Cir 1998).  If the treating physician's medical opinion is inconsistent with other substantial evidence in the record, treating source medical opinions are still entitled to deference and must be weighted using all the factors provided in 20 CFR

404.1527.  *Id.* citing SSR 96-2p.  An ALJ may rely on the medical opinion of a non-treating

doctor instead of the contrary opinion of a treating doctor only if she provides "specific and

legitimate" reasons supported by substantial evidence in the record.  *Id.*

A.  Dr. Worthen

Dr. Worthen, Allen's school psychologist, opined in 1994 that she would require

academic assistance and realistic career training.  Tr. 93-94.  Allen does not specify what, if

anything, the ALJ should have discussed from this report.  The ALJ stated that "careful

consideration had been given to all of the medical opinions in the record...."  Tr. 28.

Considering the general nature of Dr. Worthen's opinion, the ALJ did not err by failing to

address it more specifically.

B.  Dr. Earnest

On February 15, 1997, Dr. Earnest treated Allen on her admission to emergency care

following a self-inflicted knife wound.  He diagnosed depressive disorder, parent-child relational

problems, alcohol and cannabis abuse, and borderline personality traits.  He noted psychomotor

slowing,  poor insight, poor judgment, and an increased  risk of chronic psychiatric illness.  Tr.

244.

With respect to Dr. Earnest, the ALJ stated:

> The claimant was seen at the Puget Sound Hospital in February
> 1997 secondary to a self-inflicted knife wound to the abdomen,
> for which she reported this incident was an accident.  The records
> noted the claimant reported no depressive symptoms and further
> reported that over the past year, she had more time being happy
> than sad.  The claimant was diagnosed with a depressive disorder
> not otherwise specified, borderline personality traits, and alcohol
> and cannabis abuse.

Tr. 24.   The ALJ found that Allen suffered from depression, but implicitly rejected Dr. Earnest's diagnoses of borderline personality traits, psychomotor slowing, and substance abuse.   The borderline personality traits diagnosis is contradicted by examining physician Dr. Patrick, who found in May 2002, that Allen "does not appear to meet full criteria for borderline personality disorder."  Tr. 435.   However, Ms. Sakurai, also in May 2002, questioned whether a borderline personality disorder diagnosis was appropriate.   Tr. 458.

 Dr. Earnest's February 1997 diagnosis of psychomotor slowing, poor insight, and poor judgment, is consistent with the therapist's subsequent evaluation that Allen displayed "impaired ability to manage daily living activities," and with Dr. Patrick's May 2002 assessment of "possibly limited intellectual functioning" and potential lack of "attentional and/or basic achievement skills necessary for many forms of work."  Tr. 436.

Dr. Earnest's diagnosis of alcohol and cannabis abuse is corroborated by Allen's statement in January 1998 that she had been sober for four months.  Tr. 329.

The ALJ did not articulate a reason for rejecting Dr. Earnest's diagnosis of borderline personality disorder, and assessments of  psychomotor slowing, poor insight, poor judgment, and substance abuse.  Accordingly, the ALJ erred by failing to provide clear and convincing reasons for rejecting Dr. Earnest's opinions.

C.  Dr. Read

Dr. Read, a psychiatrist, treated Allen on her February 2002 psychiatric unit admission for suicidal ideation.  Tr. 421-30.  Dr. Read diagnosed suicidal ideation prior to admission, and bipolar disorder, mixed state, with a GAF of 40.  Tr. 423.

As to Dr. Read, the ALJ stated: "The claimant was seen at Good Samaritan Hospital in February 2002 secondary to suicidal ideation." Tr. 24. The ALJ does not discuss the bipolar disorder diagnosis or the GAF assessment.

The bipolar disorder diagnosis is contradicted by Dr. Patrick's May 2002 conclusion that Allen did not meet the criteria for bipolar disorder. Tr. 435. However, in July 2002 Ms. Sakurai diagnosed bipolar disorder. Tr. 508.

Allen's GAF scores, by four different assessors, were 50 in January 1998, 50 in April 2000, 40 in February 2002, 50 in May 2002, and 50 in July 2002. Tr. 326; 364; 421; 458; 508.

The ALJ did not articulate a reason for rejecting Dr. Read's diagnosis of bipolar disorder or GAF assessment of 40. Accordingly, the ALJ erred by failing to provide clear and convincing reasons for rejecting Dr. Read's opinions.

D. Dr. Patrick

Dr. Patrick examined Allen in May 2002, and diagnosed major depressive disorder. Tr. 435. The ALJ stated:

> Luke Patrick, Ph.D., evaluated the claimant in [sic] May 8, 2002 and reported a diagnosis of major depressive disorder and a past history of methamphetamine and alcohol abuse. Dr. Patrick noted the claimant may have some possible cognitive limitations and recommended further testing be performed, but that the claimant was able to manager [sic] her own funds and was able to meet the basic needs for herself as well as her child.

Tr. 24. The Commissioner argues that the ALJ adequately allowed for the possible cognitive limitations by limiting Allen's residual functional capacity to simple, routine, repetitive, unskilled work. The Commissioner also notes that Allen has not alleged mental retardation. However, the ALJ did not articulate any reason for rejecting Dr. Patrick's assessment of possible

16  - OPINION AND ORDER

cognitive limitations.  Accordingly, the ALJ erred by failing to provide specific and legitimate

reasons for rejecting Dr. Patrick's opinions.

III.  <u>Step Two Analysis</u>

Allen contends that the ALJ failed to consider the borderline personality traits diagnosis

made by Dr. Earnest and the bipolar disorder diagnosed by Dr. Read as severe impairments,

alone or in combination with depression, at step two of the analysis.  In the Ninth Circuit "an

impairment or combination of impairments can be found 'not severe' only if the evidence

establishes a slight abnormality that has 'no more than a minimal effect on an individual's ability

to work.'"  *Smolen v. Chater,* 80 F3d 1273, 1290 (9th Cir 1996)(*citing Yuckert v. Bowen,* 841 F2d

303, 306 (9th Cir 1988)).  A non-severe impairment is one that "does not significantly limit your

physical or mental ability to do basic work activities."  20 CFR § 416.921(a).  "Basic work

activities" include the "abilities and aptitudes necessary to do most jobs," and examples include

physical functions such as walking, standing, and reaching, and mental functions such as

understanding, carrying out, and remembering simple instructions, use of judgment, responding

appropriately to supervision, co-workers, and work situations, and dealing with changes in a

routine work setting. 20 CFR 416.921.

There is evidence that Allen had borderline personality traits, poor insight, poor

judgment, and bipolar disorder, as well as depression.  This evidence was not appropriately

rejected by the ALJ, nor did the ALJ set out any reason why these impairments were not severe,

particularly when these diagnoses were made in the context of hospitalization for suicide

attempts or ideation.

IV.  <u>Step Three Analysis</u>

17  - OPINION AND ORDER

Step three of the regulations provides:

> If you have an impairment(s) which meets the duration requirement
> and is listed in Appendix 1 or is equal to a listed impairment(s),
> we will find you disabled without considering your age, education,
> and work experience.

20 CFR § 404.1520(d). The ALJ found that Allen was not entitled to a presumption of disability at step three.  Allen contends that the ALJ erred in finding that (l) her impairments did not meet a listed impairment, and (2)  her impairments did not equal a listed impairment.

Because the ALJ implicitly rejected the bipolar disorder diagnosis and the borderline personality traits diagnosis, he did not consider whether either of those, alone or in combination with Allen's depression, met or equaled a listed impairment. On remand, the ALJ shall determine whether Allen's diagnoses of bipolar disorder and borderline personality traits were severe, and if so, whether alone or in combination, they met or equaled a listed impairment.

## V.  Remand For Further Proceedings

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel,* 211 F3d 1172, 1178 (9th Cir), *cert. denied,* 531 US 1038 (2000).  The court's decision turns on the utility of further proceedings.  A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is not sufficient to support the Commissioner's decision.  *Rodriguez v. Bowen,* 876 F2d 759, 763 (9th Cir 1989).

The Ninth Circuit has established a three-part test "for determining when evidence should be credited and an immediate award of benefits directed."  *Harman v. Apfel,* 211 F3d at 1178.

18  - OPINION AND ORDER

The court should grant an immediate award of benefits when:

> (l)  the ALJ has failed to provide legally sufficient reasons for
> rejecting such evidence, (2) there are no outstanding issues
> that must be resolved before a determination of disability can
> be made, and (3) it is clear from the record that the ALJ would
> be required to find the claimant disabled were such evidence
> credited.

*Id.* The second and third prongs of the test often merge into a single question:  Whether the ALJ would have to award benefits if the case were remanded for further proceedings.  *See id.* at 1178 n.2.

Even if the court credits as true the diagnoses and findings of the treating and examining physicians, it is not clear that Allen is entitled to benefits.   This case is remanded to the Secretary for proper determination of Allen's severe impairments at step two and for proper consideration of equivalence at step three.

For these reasons, the Commissioner's decision is remanded for further administrative proceedings consistent with this opinion and final judgment is entered pursuant to sentence four of 42 USC § 405(g).

Dated this 20th day of March, 2006.


 /s/ Paul Papak_____
PAUL PAPAK
United States Magistrate Judge

19  - OPINION AND ORDER